# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

SHARON AMER,                                    Case No. 1:13-cv-282
    Plaintiff,                              Spiegel, J.
                                                  Litkovitz, M.J.

    vs.

COMMISSIONER OF                                 **REPORT AND**
SOCIAL SECURITY,                                **RECOMMENDATION**
    Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 11), the Commissioner's response in opposition (Doc. 16), and plaintiff's reply memorandum (Doc. 19).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in September 2009, alleging disability since January 30, 2008, due to depression, disc injury, diabetes, high blood pressure, and stomach problems. These applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before administrative law judge (ALJ) Larry A. Temin. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On November 21, 2011, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

2

548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

    **B.**   **The Administrative Law Judge's Findings**

    The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2012.

> 2. The [plaintiff] has not engaged in substantial gainful activity since January 30, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

> 3. The [plaintiff] has the following severe impairments: coronary artery disease, status post right coronary artery catheterization and stent placement; degenerative disc disease of the lumbar spine; diabetes mellitus; obesity; headaches; and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> 5. After careful consideration of the entire record, the [ALJ] finds that [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, [plaintiff] can perform work activity except as follows: [plaintiff] can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for up to 6 hours in an eight-hour workday and sit for 6 hours in an eight-hour work day. [Plaintiff] can only occasionally stoop, kneel, crouch and climb ramps/stairs. She should not crawl, climb ladders, ropes, or scaffolds, or work at unprotected heights or around hazardous machinery. Mentally, she is able to perform only simple, routine, repetitive tasks. Her job should not require intense, focused attention or an inflexible work pace. Her job should not require more than ordinary and routine changes in work setting or duties.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1960 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The [plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from January 30, 2008, through the date of this decision (20 C.F.R. 404.1520(g)) and 416.920(g)).

(Tr. 124-34).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[1]Plaintiff's past relevant work was as a cashier and truck driver. (Tr. 160, 280).
[2]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 9,700 unskilled, light jobs in the regional economy, citing as examples of such jobs a cleaner, shipping/receiving, and light unskilled clerical support. (Tr. 133, 162).

4

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff raises three assignments of error. First, plaintiff argues that the ALJ improperly weighed the medical opinions of record. Specifically, plaintiff asserts the ALJ improperly discounted the opinion of Therapist Donald Chell; mischaracterized the opinion of consultative examining psychologist David Chiappone, Ph.D.; and improperly ignored the functional capacity evaluation (FCE) performed by physical therapist, Rick Wickstrom, which

5

provides that plaintiff is limited to sedentary work.[3]   Second, plaintiff contends the ALJ's

residual functional capacity (RFC) finding is not supported by substantial evidence because he

improperly assessed her "severe" and "not severe" impairments.   Third, plaintiff argues the ALJ

erred in discounting plaintiff's credibility.   (Doc. 11 at 11-19).   The Court will first address

plaintiff's severity argument.

    1. The ALJ did not err in classifying the severity of plaintiff's impairments.

    For her first assignment of error, plaintiff asserts the ALJ erred by not finding her

gastrointestinal conditions, *i.e.*, dysphagia, esophageal dysmotility, gastroesophageal reflux

disease (GERD), and diverticulitis, to be severe impairments.   In support, plaintiff cites to

evidence documenting that she suffers from these conditions and to July 2011 treatment records

from the Gastrointestinal Center at University Health that include a diagnosis of "ineffective

esophageal motility" with a notation that this condition is not medically treatable.   (Doc. 1006).

Plaintiff asserts that these conditions cause pain and discomfort severe enough to interfere with

her ability to maintain attention and concentration or pace and are likely to cause work absences.

Accordingly, plaintiff contends the ALJ erred at Step Two of the sequential analysis by not

classifying these conditions as severe impairments.   (Doc. 11 at 17).

    A severe impairment or combination of impairments is one which significantly limits the

physical or mental ability to perform basic work activities.   20 C.F.R. §§ 404.1520(c),

416.920(c).   In the physical context, this means a significant limitation upon a plaintiff's ability

---

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.   Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.   Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."   20 C.F.R. §§ 404.1567(a), 416.927(a).

to walk, stand, sit, lift, push, pull, reach, carry or handle. 20 C.F.R. §§ 404.1521(b)(1),

416.921(b)(1). Basic work activities relate to the abilities and aptitudes necessary to perform

most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing,

and the ability to use judgment, respond to supervisors, and deal with changes in the work

setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). Plaintiff is not required to establish total

disability at this level of the sequential evaluation. Rather, the severe impairment requirement is

a threshold element which plaintiff must prove in order to establish disability within the meaning

of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be

considered nonsevere only if it is a "slight abnormality which has such minimal effect on the

individual that it would not be expected to interfere with the individual's ability to work,

irrespective of age, education, and work experience." *Farris v. Sec'y of H.H.S.*, 773 F.2d 85, 90

(6th Cir. 1985) (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)). The severity

requirement is a "*de minimus* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880

F.2d 860, 862 (6th Cir. 1988). *See also Rogers*, 486 F.3d at 243 n.2.

     Here, the ALJ classified plaintiff's gastrointestinal conditions as non-severe after

engaging in a limited discussion of the pertinent medical evidence and noting that there was "no

specific indication in the record from any medical source that such impairments significantly

impact upon [plaintiff]'s ability to engage in basic work-related activities." (Tr. 125). A

review of the record supports the ALJ's characterization of plaintiff's gastrointestinal conditions.

     The medical evidence of record includes diagnoses of diverticulitis (Tr. 383, 455, 565,

684), GERD (Tr. 423, 455, 759, 1006), dysphagia (Tr. 759), and esophageal motility. (Tr.

1006). However, there is no medical finding or opinion evidence in the record establishing that

7

any of these conditions impact plaintiff's functional abilities. As the ALJ noted, the treatment

options given to plaintiff consist primarily of instructing her to modify her diet and to eat

frequent, small meals. (Tr. 565, 759, 1006). Plaintiff was discharged from the Gastrointestinal

Clinic at University Health in July 2011 as the medical providers believed there was "no further

benefit/options for treatment." (Tr. 1006). The lack of treatment for these conditions supports

the ALJ's determination that they were not severe. Notably, plaintiff herself did not testify or

otherwise report to the Commissioner that these conditions cause her any functional limitations.

*See* Tr. 144-59 (plaintiff's ALJ hearing testimony); Tr. 279-84, 294-300, 307-14, 330-35 (aside

from listing "stomach problems" as a condition limiting her ability to work on a September 23,

2009 Disability Report, plaintiff's reports to the Commissioner regarding her medical

impairments primarily regard her mental impairments and back conditions). In the absence of

any affirmative evidence establishing that plaintiff is functionally limited due to her

gastrointestinal impairments, it was reasonable for the ALJ to classify them as non-severe.

Plaintiff further argues that the ALJ erred by ignoring her anemia and failing to classify it

as a severe or non-severe impairment. Plaintiff cites to evidence showing that she required daily

vitamin B12 injections and Iron supplements in 2009 and argues that such anemia can cause

fatigue and reduced stamina, which the ALJ failed to accommodate in his RFC finding.

Plaintiff's argument is unavailing.

There is little evidence of record regarding plaintiff's anemia. In August 2010,

plaintiff's Vitamin B12 and iron levels were below normal (Tr. 630, 635); she was given vitamin

B12 injections and prescribed Iron supplements. (Tr. 629, 1009). At a September 16, 2010

follow-up visit with her primary medical provider, plaintiff reported that she was "[f]eeling better

8

with b12 shot" and the provider noted they would recheck her levels in two months.   (Tr. 628).

An October 20, 2010 treatment note provides that plaintiff's "anemia remains stable.   Will not

change medication, continue to monitor for complications."   (Tr. 621).   There is no further

evidence in the record regarding plaintiff's anemia.

This limited evidence, without more, does not demonstrate that plaintiff's anemia caused

any, much less a significant, limitation on plaintiff's work abilities.   Plaintiff's argument that

severe anemia can lead to fatigue and reduced stamina, though potentially true, is unsupported by

the record.   No medical source ever opined that her anemia limited her in any manner

whatsoever.   Further, the evidence shows that plaintiff's anemia resolved with treatment and

was stable.   *See* Tr. 621.   It is incumbent upon plaintiff at Step Two of the sequential analysis to

put forth evidence demonstrating that her anemia is a severe impairment.   *Rabbers*, 582 F.3d at

652.   The evidence here simply does not show that plaintiff's anemia ever limited her functional

abilities such that it would properly be categorized as a severe impairment.

For these reasons, the undersigned finds that the ALJ's decision to classify plaintiff's

gastrointestinal impairments as nonsevere is substantially supported.   Further, the ALJ did not

err by failing to discuss plaintiff's anemia as the limited evidence in the record regarding this

condition does not show that it had any limiting effect on plaintiff's functional abilities.

Accordingly, plaintiff's first assignment of error should be overruled.

2. The ALJ did not err in weighing the opinion evidence of record.

For her second assignment of error, plaintiff argues the ALJ erred in weighing the

medical opinions of record.   Plaintiff asserts the ALJ erred by: (1) giving "little weight" to the

mental assessments completed by her therapist, Donald Chell, PCC-S; (2) failing "to consider the

true impact" of the opinion of consultative examining psychologist, David Chiappone, Ph.D.; and

(3) ignoring the Functional Capacities Evaluation (FCE) completed by physical therapist Rick

Wickstrom.   Plaintiff's arguments will be addressed in turn.

"The Commissioner has elected to impose certain standards on the treatment of medical

source evidence."   *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).   "These standards, set

forth in administrative regulations, describe (1) the various types of evidence that the

Commissioner will consider, 20 C.F.R. § 404.1512; (2) who can provide evidence to establish an

impairment, 20 C.F.R. § 404.1513; and (3) how that evidence will be evaluated, 20 C.F.R. §

404.1520b.   *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).   This

evidence may include "medical opinions, which 'are statements from physicians and

psychologists . . . that reflect judgments about the nature and severity of [a claimant's]

impairment(s), including [ ] symptoms, diagnosis and prognosis,' physical and mental

restrictions, and what the claimant can still do despite his or her impairments."   *Id.*, (citing 20

C.F.R. 404.1527(a)(2)).

The applicable regulations lay out the three types of acceptable medical sources upon

which an ALJ may rely on: treating source, nontreating source, and nonexamining source.   20

CFR §§ 404.1502, 416.902.   When treating sources offer opinions, the Social Security

Administration is to give such opinions the most weight and is procedurally required to "give

good reason in [its] notice of determination or decision for the weight [it gives the claimant's]

treating source's opinion."   *Smith v. Comm'r of Soc. Sec.*, 482 F.3d at 875.   This requirement

only applies to treating sources.   *Id.* at 876.   "With regard to nontreating, but examining,

sources, the agency will simply generally give more weight to the opinion of a source who has

10

examined the claimant than to the opinion of a source who has not examined him." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1)) (internal citations omitted).  With this framework in mind, the Court turns to plaintiff's arguments.

     a. *Therapist Chell*

The record shows that plaintiff received mental health treatment at Centerpoint from September 2008 to at least July 2011, where she was diagnosed with major depressive disorder. (Tr. 571-83, 597-619, 647-78, 821-51).  Plaintiff received counseling from Mr. Chell.  Carlos Cheng, M.D., was her treating psychiatrist until David V. Berkowitz, M.D., replaced him in July 2011. *See* Tr. 838-39.  Mr. Chell completed two mental impairment questionnaires on plaintiff's behalf: the first in July 2010 and the second in July 2011.  (Tr. 590-93, 817-20).

In July 2010, Mr. Chell reported that he treated plaintiff from April 2008 through July 2010.  (Tr. 591).  Mr. Chell opined that plaintiff is markedly limited in her ability to: understand, remember, and carry out detailed, but not complex, job instructions; maintain regular attendance and be punctual within customary tolerances; accept instructions and criticisms from supervisors; maintain concentration, persistence or pace so as to complete tasks in a timely manner in work or work-like settings; and deal with, on a sustained basis, the stress of getting to work regularly, having her performance supervised, and remaining in the work place for a full day.  (Tr. 591-92).  Mr. Chell also reported that plaintiff has had repeated episodes of decompensation, each of an extended duration.  (Tr. 593).

In July 2011, Mr. Chell reported that he had treated plaintiff since September 24, 2009 to the present.  (Tr. 818).  Mr. Chell opined that plaintiff had marked limitations in her abilities to:

understand, remember, and carry out complex job instructions; accept instructions and criticisms from supervisors; maintain concentration, persistence or pace so as to complete tasks in a timely manner in work or work-like settings; and deal with, on a sustained basis, the stress of getting to work regularly, having her performance supervised, and remaining in the work place for a full day. (Tr. 818-19). Mr. Chell reported improvement in two areas previously considered to be markedly limited: he opined that plaintiff was moderately limited in her ability to understand, remember and carry out detailed, but not complex, job instructions, and less than moderately limited in her ability to maintain regular attendance and be punctual with customary tolerance. (Tr. 818). Mr. Chell provided no narrative explanation for either opinion and cited to no objective or clinical evidence supporting his findings.

The ALJ gave "little weight" to Mr. Chell's opinions "because he gives no support for them and his treatment notes do not reflect the level of limitations he reported on the assessment forms. . . ." (Tr. 132). The ALJ further explained that Mr. Chell's treatment notes did not indicate that plaintiff would have undue difficulty performing unskilled work." (*Id.*). In discussing this evidence, the ALJ found that the Centerpoint treatment notes reflected that plaintiff had shown improvement in her mental health condition, as evidenced by her self-reports. (Tr. 130). The ALJ further noted that this evidence did not include mention of serious symptoms and, while plaintiff had a recent suicide attempt,[4] she recovered from the episode after

---

[4]On August 1, 2011, plaintiff was taken to University Hospital following an overdose of 25-30 mg of Ativan. (Tr. 887). Plaintiff tested positive for barbiturates, benzodiazepines, marijuana, and tricyclic antidepressants; she denied taking tricylics or marijuana. (*Id.*). Plaintiff reported an inordinate level of stress in her life due to being responsible for taking care of her parents and additional family and financial stressors. (*Id.*). At discharge, plaintiff reported that she did not know if she wanted to kill herself or "just wanted a break from reality." (Tr. 884). She was discharged after reporting no further suicidal ideation at which time she was described as "superficially bright, pleasant, [and] cooperative. . . ." (Tr. 886).

a one-day admission as her Global Assessment of Functioning (GAF) score was 20 upon

admission and 65 at discharge.[5]   (Tr. 131, citing Tr. 883, 889).

Plaintiff argues that the ALJ erred in discounting Mr. Chell's opinions in two ways: (1)

the ALJ refused to find that the notes from Dr. Cheng, her treating psychiatrist at Centerpoint,

supported Mr. Chell's opinion because the ALJ had trouble reading the psychiatrist's notes; and

(2) the ALJ was overly-reliant on the GAF scores in the record in assessing Mr. Chell's opinions.

Plaintiff argues that Dr. Cheng's notes are not entirely illegible and they support Mr.

Chell's opinions.   Plaintiff also argues that the ALJ should have credited Mr. Chell's opinions as

they are supported by his own progress notes.   Plaintiff acknowledges that Mr. Chell's progress

notes frequently report that plaintiff had a bright mood and appropriate affect, but requests that

the Court focus on the more descriptive narrative portions of Mr. Chell's notes.   (Doc. 11 at

12-13).

While plaintiff asserts the ALJ discounted Mr. Chell's opinions due to the illegibility of

Dr. Cheng's treatment notes, this is not the case.   As stated above, the ALJ did not credit Mr.

Chell's opinions because they were not supported by *his* treatment notes, which he found did not

reflect an individual with serious mental health symptoms.   (Tr. 132).   The ALJ additionally

noted that while Dr. Cheng's notes were difficult to read, they did "not present a picture of

disability" as evidenced by a September 2008 note wherein he assigned plaintiff a GAF score of

---

[5]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).   The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."   *Id.*   The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).   *Id.* at 34.   Individuals with scores of 11 to 20 are classified as being in some danger of hurting self or others (*e.g.*, suicide attempts without clear expectation of death).   *Id.*   Individuals with scores of 61 to 70 are classified as having "some mild symptoms" (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning but generally functioning pretty well.   *Id.*

13

55-60. (Tr. 131, citing Tr. 678). Thus, to the extent plaintiff asserts the ALJ discounted Mr.

Chell's opinions due to the illegibility of Dr. Cheng's notes, the Court finds no error as this was

not a basis for the ALJ's decision.[6]

Further, review of the Centerpoint records supports the ALJ's determination that Mr.

Chell's opinions are inconsistent with both his and Dr. Cheng's treatment notes. The record

includes Mr. Chell's treatment notes from December 8, 2010 to July 22, 2011. (Tr. 822-37).

The notes consistently describe plaintiff as cooperative and with an appropriate affect and bright

mood, though in July 2011 plaintiff presented with a apprehensive and anxious mood. *See* Tr.

825-37. Further, review of the narrative portions of Mr. Chell's notes substantially supports the

ALJ's determination that they do not reflect an individual with marked limitations.[7] *See* Tr.

836-37 (in December 2010, plaintiff discussed family and home stressors and worked on her

coping skills); Tr. 835 (in January 2011, plaintiff talked about family problems and medication

issues and worked on her stress management skills); Tr. 832-34 (treatment notes from February

to March 2011 reflect similar interactions in therapy); Tr. 831 (on April 6, 2011, plaintiff was

"broken up and crying" due to recent death of her grandson and she worked on grief issues with

Mr. Chell); Tr. 830 (on April 20, 2011, plaintiff worked towards goals and problem solving

skills); Tr. 829 (the May 18, 2011 treatment notes do not contain a narrative description); Tr.

---

[6]Notably, even if the ALJ had discounted Mr. Chell's opinion on this basis, it is plaintiff's burden to put forth evidence establishing disability. *See Rabbers*, 582 F.3d at 652; *Wilson*, 378 F.3d at 548. The unfortunate fact that plaintiff's evidence may be largely illegible and that Dr. Cheng was unable to provide a transcription of his notes due to a change in his employment (Tr. 1017) does not relieve her of this burden nor does it require the Commissioner to accept plaintiff's word in lieu of objective, clinical, or opinion evidence. Moreover, where, as here, the ALJ provides an otherwise substantially supported basis for discounting opinion evidence, such as lack of support, the illegibility of large portions of treatment records does not warrant reversal. *See Anderson v. Astrue*, No. 11-cv-15636, 2012 WL 4867703, at *13 (E.D. Mich. Sept. 18, 2012).

[7]The Court acknowledges plaintiff's request that it focus on the narrative portions of Mr. Chell's treatment notes; however, there is little documentation of Mr. Chell's observations as the narratives consist mostly of plaintiff's therapeutic goals.

827-28 (in June 2011, plaintiff talked about her anxiety, her health and medications, and her family problems and she worked on stress management and coping skills). As noted by the ALJ, there is no observation of serious mental health symptoms in any of Mr. Chell's notes that would support his findings of marked limitations. Dr. Cheng and Dr. Berkowitz's treatment notes are similar inasmuch as they include observations of plaintiff being mildly depressed, tense, stressed, irritable, and presenting with a restricted or constricted affect, but also with logical and organized thought processes and fair activities of daily living. (Tr. 838, 840, 842, 844, 846, 848, 850). The most recent note from Dr. Berkowitz in July 2011 includes plaintiff's reports of feeling more stable on Seroquel and his observation that plaintiff was tense and mildly depressed with a restricted affect but no thought disorder. (Tr. 838). Review of this evidence substantially supports the ALJ's determination that the limited findings therein do not support the marked limitations assigned to plaintiff by Mr. Chell.

Moreover, the ALJ was not required to give any special credence to Mr. Chell's opinions as social workers are not "acceptable medicals sources." Only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) and § 416.913(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight.[8] Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how

_____

[8]SSR 06-03p provides that the Commissioner will consider all available evidence in an individual's case record, including evidence from medical sources. The term "medical sources" refers to both "acceptable medical sources" and health care providers who are not "acceptable medical sources." *Id.* (citing 20 C.F.R. § 404.1502 and § 416.902). Licensed physicians and licensed or certified psychologists are "acceptable medical sources." *Id.* (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)). Licensed social workers are not "acceptable medical sources" and instead fall into the category of "other sources." *Id.* (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)).

15

it affects the individual's ability to function." *Id.* Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. *Id. See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Not every factor will apply in every case. SSR 06-03p.

Here, the ALJ appropriately considered Mr. Chell's opinions as "other source" evidence and found that they were entitled to "little weight" because his findings were not well-explained and not supported by the evidence from Centerpoint. As the ALJ's determination in this regard is supported by substantial evidence, his decision should be affirmed.

Plaintiff's second assertion is that the ALJ was overly reliant on the plaintiff's GAF scores in determining the level of her mental health functioning, to the exclusion of other record evidence. (Doc. 11 at 13). Plaintiff does not explain what other evidence the ALJ purportedly ignored and this Court's review of the treatment records from Centerpoint reveal that there is little other evidence that the ALJ could have considered. There is no objective testing evidence and there is little by way of clinical observations in these treatment records. It is thus entirely unclear how the ALJ erred by citing to one of the few pieces of clinical evidence in the record in assessing the validity of Mr. Chell's opinions.[9] As the undersigned finds that the ALJ's decision

---

[9]To support this assertion, plaintiff cites to *Smith v. Astrue*, 565 F. Supp.2d 918 (M.D. Tenn. 2008), where the court held that an ALJ improperly discredited the opinion of a treating psychiatrist primarily due to an alleged inconsistency between the doctor's findings of marked limitations and assigning the plaintiff a GAF score of 55. *Smith* involved a situation where an ALJ discounted the opinion of a treating psychiatrist based on the GAF score alone. *Id*. at 925. Mr. Cheng was not a treating doctor and the ALJ provided other substantially supported reasons for discounting his opinion, *i.e.*, its lack of support; consequently, *Smith* is inapposite.

to give "little weight" to Mr. Chell's opinions is substantially supported, it was not error for the ALJ to rely, in part, on the GAF scores in the medical record in evaluating this opinion evidence.

b. *Dr. Chiappone*

Plaintiff's argument regarding Dr. Chiappone is somewhat confusing. It appears that plaintiff argues that despite assigning no more than moderate limitations to plaintiff in all areas of her mental health functioning, *see* Tr. 528, that his opinion nevertheless supports a finding that plaintiff is disabled. Plaintiff speculates that because Dr. Chiappone opined she was moderately impaired in her ability to maintain concentration, persistence and pace to perform simple repetitive tasks and withstand the stress of daily work, she "would incur disciplinary action from supervisors for such breaches in attention at a rate that is at least 'moderate'" which plaintiff asserts, without providing evidentiary support, would translate to 20% of the time. (Doc. 11 at 13-14).

Plaintiff's argument is entirely premised on supposition and her claim that the ALJ misinterpreted Dr. Chiappone's findings of moderate limitations in these functional areas has no basis in fact or law. Further, the argument wholly ignores the remainder of Dr. Chiappone's findings, which include his observations that plaintiff was cooperative and presented with logical, relevant, and goal-direct speech. (Tr. 526). Dr. Chiappone found that plaintiff was depressed, but did not appear anxious, manic, homicidal, or suicidal. (Tr. 526-27). Consistent with his assignation of moderate limitations, Dr. Chiappone found that plaintiff had low average intelligence, adequate memory, good persistence, and reduced concentration. Dr. Chiappone concluded that plaintiff's ability to understand and follow instructions was not impaired; she had moderate impairments in her ability to maintain attention; she had mild impairment in relating to

17

others; and she had moderate impairment in her ability to withstand the stress and pressure associated with day to day work activities. (Tr. 527-28). Dr. Chiappone assigned a functional GAF score of 61, indicating mild limitations, and a symptoms score of 55, indicating moderate symptoms. (*Id.*).

Dr. Chiappone's assessment, viewed in its entirety, reflects an individual who has some limitations in the type of work she is able to engage in but is otherwise capable of employment. Notably, plaintiff reported that she was, in fact, working on a part-time basis at the time Dr. Chiappone evaluated her. (*Id.*). There is simply no evidentiary basis whatsoever supporting plaintiff's contention that, pursuant to Dr. Chiappone's opinion, she would be disciplined 20% of the time at work due to her moderate limitations. The Court therefore finds that the ALJ did not fail to consider the "true impact" of Dr. Chiappone's opinion as plaintiff asserts and, thus, there is no error.

c. *Physical Therapist Wickstrom*

Plaintiff argues the ALJ "improperly ignored the FCE report [from physical therapist Wickstrom] which said [she] is limited to sedentary work." (Doc. 11 at 14). Plaintiff goes on to argue that the ALJ erred by giving this opinion "little weight" as Mr. Wickstrom's opinion that plaintiff is limited to sedentary work was a permanent restriction and is supported by detailed, thorough objective testing. Plaintiff thus asserts the ALJ should have found plaintiff disabled under the Medical-Vocational guidelines because a limitation to sedentary work at her age would preclude employment. (Doc. 11 at 14-15). For the reasons that follow, the undersigned finds that the ALJ did not err in weighing Mr. Wickstrom's opinion.

At the outset, the Court notes that the ALJ did not "ignore" Mr. Wickstrom's opinion as asserted by plaintiff. Indeed, the ALJ's decision includes the following discussion:

> [Plaintiff] underwent a functional capacity evaluation in July 2010 (Exhibit 28F). The examiner, Mr. Wickstrom, PT, CPE, CDMS, determined that [plaintiff] was capable of performing unskilled sedentary level work. He noted that the [plaintiff]'s maximum prognosis would be light level physical work on a part-time basis. This would require motivated participation in physical conditioning on the [plaintiff]'s part.

(Tr. 129). The ALJ then explained that he assigned "little weight" to Mr. Wickstrom's FCE "as it was conducted less than two months after the exacerbation of the [plaintiff]'s cardiac condition and the evaluation was completed as part of [plaintiff]'s cardiac rehabilitation." (Tr. 131-32). The ALJ also noted that Mr. Wickstrom "is not an acceptable medical source as defined in SSR 06-3p." (Tr. 132). The ALJ's discussion regarding Mr. Wickstrom's FCE clearly contradicts plaintiff's assertion that it was improperly ignored by the ALJ. Moreover, the ALJ's decision to give "little weight" to Mr. Wickstrom's opinion due to its proximity in time to plaintiff undergoing cardiac surgery is substantially supported by the evidence of record.

Plaintiff was referred to Mr. Wickstrom for a comprehensive functional capacity evaluation by her primary care physician. (Tr. 337). The FCE was performed on July 23, 2010; on May 26, 2010, plaintiff had two stents put in her heart. (*Id*.). At the time of this evaluation, plaintiff reported she had recently participated in cardiac rehabilitation following her stent placement. (Tr. 339). As for her lifestyle activities, plaintiff reported that she took care of her father who has medical problems, is independent in driving her car, does "usual chores" such as shopping for groceries, running errands, cooking meals, vacuuming, cleaning the bathroom, and cleaning her son's room. *Id*. She had no problem with dressing, using the bathroom, grooming,

or managing her finances. *Id.* Plaintiff reported mild difficulties with bathing, stairs, light housework, walking, learning and breathing. (Tr. 339-40).

Testing revealed that plaintiff had fair to good range of motion throughout, normal reflexes and strength in her upper extremities, and some reduced reflexes and extension in her lower extremities. (Tr. 340). Mr. Wickstrom determined that plaintiff had a very low ambulation stamina and could frequently lift or carry only one pound at a time, could occasionally stand, and could sit constantly. (Tr. 348). Accordingly, Mr. Wickstrom found that plaintiff would be permanently restricted to performing sedentary work with only occasional standing or bending, or light work part time if it required constant standing. (*Id.*).

The ALJ gave "little weight" to Mr. Wickstrom's findings as noted above. Plaintiff does not dispute the basis for the ALJ's determination – that the FCE was completed only two months after she received her stents – but asserts that because Mr. Wickstrom noted these were "permanent restrictions" (Tr. 348), the timing of the testing does not justify discounting the opinion.[10] Plaintiff's arguments do not persuade the Court that the ALJ erred in weighing this opinion evidence in light of other substantial contradicting evidence and Mr. Wickstrom's status as a physical therapist.

Non-examining state agency physician Paul Morton, M.D., reviewed the record in February 2010 and opined that plaintiff could lift, carry, push, and pull up to 50 pounds occasionally and 25 pounds frequently; sit about six hours in an eight-hour work day; and stand and/or walk about six hours in an eight-hour work day. (Tr. 550). Dr. Morton also found that

_____

[10]Insofar as plaintiff argues the ALJ erred by describing the FCE "as part of [plaintiff]'s cardiac rehabilitation" (Tr. 131), the undersigned does not find this distinction relevant. The only evidence of record regarding the purpose of the FCE is Mr. Wickstrom's notation that plaintiff was referred to him by her family physician. Whether or not she underwent the FCE in connection with her cardiac rehabilitation or pursuant to her

plaintiff could only frequently stoop and crouch.  (Tr. 551).  Dr. Morton found plaintiff's statements of her symptoms credible.  (Tr. 554).  In May 2010, Sarah Long, M.D., reviewed plaintiff's medical record and affirmed Dr. Morton's assessment.  (Tr. 585).

The ALJ gave "significant weight" to these doctors' opinions finding them to be "generally consistent with the record evidence."  (Tr. 131).  Nevertheless, the ALJ gave plaintiff the benefit of the doubt and limited her to light level work.  Review of the record supports the ALJ's determination.  For example, at a January 2011 physical examination, plaintiff had full strength, full range of motion, normal muscle tone and reflexes in all extremities, and a normal gait.  (Tr. 762-64).  A May 2011 examination revealed similar findings.  (Tr. 1011-13).  Such findings are inconsistent with Mr. Wickstrom's FCE opinion.  Given the more recent findings of full strength and the opinions of the state agency reviewing physicians, there is substantial evidence supporting the ALJ's decision to reject the limitations put forth by Mr. Wickstrom.

Moreover, the ALJ was not required to give any special weight to Mr. Wickstrom's opinion because as a physical therapist, he is not a "medical source" who is qualified to assess the severity of plaintiff's impairments and functioning.  Physical therapists are not acceptable medical sources under the Social Security regulations.  *Compare* 20 C.F.R. § 404.1513(a) (acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists), with 20 C.F.R. § 404.1513(d)(1) (medical sources not listed in § 1513(a), such as nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists and therapists are considered to be "other sources" rather than "acceptable medical sources").  *See also Nierzwick v. Comm'r of*

_____

attorney's request for an opinion on her functional abilities as plaintiff asserts (Doc. 11 at 15), the fact remains that she underwent the testing two months post-stent placement.

*Soc. Sec.*, 7 F. App'x 358, 363 (6th Cir. 2001) (physical therapist's report not afforded significant weight because therapist not recognized as an acceptable medical source); *Jamison v. Comm'r*, No. 1:07-cv-152, 2008 WL 2795740, at *10 (S.D. Ohio July 18, 2008) (Dlott, J.) (same). Because physical therapists are not considered acceptable medical sources under the regulations, the ALJ was not required to give any special deference to Mr. Wickstrom's opinion.   Thus, it was not error for the ALJ to give greater weight to the opinions of the state agency reviewing physicians, which were consistent with the subsequent objective evidence showing plaintiff had full strength.

For the above reasons, the Court finds the ALJ did not err in weighing the opinions of record and recommends that plaintiff's second assignment of error be overruled.

3. <u>The ALJ did not err in discounting plaintiff's credibility</u>.

For her final assignment of error, plaintiff asserts the ALJ erroneously discounted her credibility.   Plaintiff argues the ALJ improperly relied on plaintiff's status as her parents' caretaker in determining that she was not as physically limited as she testified given the limited nature of this care, *i.e.*, running errands and driving them to appointments.   Plaintiff maintains that the ALJ's description might make one believe she was lifting her parents, or dressing and feeding them, which was not the case.   Plaintiff further asserts the ALJ mischaracterized the record regarding her inability to attend physical therapy and medical appointments by failing to recognize the costs associated with traveling to appointments, such as the high cost of gasoline. Plaintiff also contends the ALJ erred in describing her activities of daily living given her reports of worsening pain and increased limitations over time.   (Doc. 11 at 18-19).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of

witnesses, including that of the claimant. *Rogers*, 486 F.3d at 247 (citations omitted). In light

of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's

credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,*

246 F.3d 762, 773 (6th Cir. 2001); *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's

testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35

F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a

claimant's testimony must be explicit and "is absolutely essential for meaningful appellate

review." *Hurst v. Sec'y of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v.*

*Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible

or intuitive notion about an individual's credibility." *Rogers,* 486 F.3d at 247. Rather, such

determination must find support in the record. *Id.* Whenever a claimant's complaints regarding

symptoms or their intensity and persistence are not supported by objective medical evidence, the

ALJ must make a determination of the credibility of the claimant in connection with his or her

complaints "based on a consideration of the entire case record." *Id.* Consistency between a

claimant's symptom complaints and the other evidence in the record tends to support the

credibility of the claimant while inconsistency, although not necessarily defeating, should have

the opposite effect. *Id.*

Here, the ALJ determined that plaintiff's statements were not credible based on: (1) her

inconsistent reporting; (2) her noncompliance with treatment advice; and (3) her activities of

daily living. (Tr. 131). As to the inconsistent reporting, the ALJ noted that plaintiff denied

using marijuana but tested positive for marijuana in August 2011. (Tr. 131, citing Tr. 944).

23

Regarding noncompliance, the ALJ noted that plaintiff had stopped attending physical therapy for her back, stopped going to cardiac rehabilitation, and failed to monitor her blood sugar as directed. (Tr. 131). As for her activities of daily living, the ALJ explained that plaintiff's reports of going to the grocery store, going to the movies, going out to eat, driving, doing chores, self-grooming, and being the "chief caregiver for her elderly parents" were inconsistent with her reports of disabling conditions. (*Id.*). Review of the record evidence substantially supports the ALJ's determination.

First, plaintiff does not dispute that she tested positive for marijuana in August 2011 (Tr. 944) or that she testified three months later, inconsistent with this evidence, that she did not use recreational drugs and did not know how it was in her system. (Tr. 157). Plaintiff offers no explanation for why marijuana was found in her system, nor does she attempt to reconcile the inconsistency between her statement and the August 2011 urinalysis results. In the absence of any evidence or argument to the contrary on this issue, the Court finds that it was reasonable for the ALJ to discount plaintiff's credibility on this basis.

Second, the ALJ accurately determined that plaintiff had a history of noncompliance with medical treatment. At a follow-up visit in October 2010, plaintiff's doctor reported that plaintiff "did not bring her [blood sugar] log book as [I] had instructed to her on last visit and also over the phone last week. I suspect she is not checking her [blood sugar] as she is suppose[d] to." (Tr. 620). The record also reflects that plaintiff stopped attending cardiac rehabilitation "due to medical transportation and financial problems" (Tr. 646) and that she stopped attending physical therapy after "2-3 times due to lack of time/transportation or family problems. . . ." (Tr. 738). The ALJ found that plaintiff's explanation for stopping this treatment due to transportation issues

was not credible given that she was able to drive and that her noncompliance was "not indicative of an individual doing all that he or she is able to do to improve his or her condition."  (Tr. 131).

Plaintiff does not dispute, or even address, her noncompliance with monitoring her blood sugar.  However, she asserts the ALJ failed to recognize that "gasoline is expensive, and has become a bar to driving as frequently as is required for physical therapy or cardiac rehabilitation appointments" which are costly in and of themselves.  (Doc. 11 at 18).  The fundamental flaw in plaintiff's argument is that the record evidence does not demonstrate that she stopped attending her appointments due to the price of gas.  Plaintiff reported, rather, that she stopped going to physical therapy due to "lack of time/transportation or family issues."  (Tr. 738).  It is unclear how plaintiff did not have the time to attend physical therapy sessions in light of her unemployed status.  Further, plaintiff reported that she drives her mother to the store and to doctors' appointments (Tr. 294), which is inconsistent with her reports of not having access to transportation.  To the extent that the cost of gas or the cost of these appointments prohibited plaintiff's ability to attend, the ALJ was permitted to reject plaintiff's explanation as there is other evidence in the record that calls into question her credibility.  *See Henry v. Comm'r of Soc. Sec.*, __ F. Supp.2d__, 2013 WL 5298331, at *4 (N.D. Ohio Sept. 21, 2013).

Third, the ALJ's finding that plaintiff's activities of daily living are inconsistent with her reports of disabling pain is substantially supported by the record evidence.  Plaintiff asserts the ALJ believed that in her role as caretaker, she was "picking her parents up out of beds and chairs, or dressing and feeding them" when, in fact, she was merely running errands for them and managing their medications.  (Doc. 11 at 18).  Plaintiff's assertion is curious given the ALJ clearly found that she was not capable of lifting more than twenty pounds at a time when he

25

formulated her RFC for light work.   *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) ("Light work involves lifting no more than 20 pounds at a time. . . .").   Plaintiff has put forth no evidence showing the ALJ failed to accurately comprehend plaintiff's role as her parents' caretaker. Nevertheless, the ALJ's determination that plaintiff's activities of daily living were not consistent with her allegations of disability is substantially supported by other evidence of record.

For example, plaintiff reported in October 2009 that she prepares meals on a daily basis, including complete meals (not sandwiches), does some cleaning and laundry, and mows the yard. (Tr. 294-96).   While plaintiff reported in March 2010 that her pain worsened, she was still cooking meals and had just finished working a part-time seasonal job as a cashier.   (Tr. 311-13).[11]   Further, plaintiff was still able to carry her grocery bags (Tr. 324) and testified that she could lift a ten pound bag of potatoes (Tr. 149), but inconsistently reported that she was unable to lift more than five pounds.   (Tr. 330).   This evidence, as well as the evidence cited by the ALJ, substantially supports his determination to discredit plaintiff's allegations of disability.

For the above reasons, plaintiff's final assignment of error should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date:  4/2/2014

Karen L. Litkovitz
United States Magistrate Judge

---

[11]Notably, plaintiff asserts in her Statement of Errors that she quit this job due to back pain (Doc. 11 at 19). However, she testified that she tried to stay at the job despite having pain due to standing so long, but that they were not hiring at the time.  *See* Tr. 147.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

SHARON AMER,                                 Case No. 1:13-cv-282
      Plaintiff,

                                       Spiegel, J.
   vs.                                 Litkovitz, M.J.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).